**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

WILLIAM F. SHERLOCK and   :
PATRICIA A. SHERLOCK,    :
            :
    Plaintiffs,   :  CIVIL ACTION
            :
  v.         :  No. 04-cv-3438
            :
ROBERT HERDELIN and    :
44 FINANCIAL CORP.,    :
            :
    Defendants.   :

**<u>MEMORANDUM AND ORDER</u>**

**Joyner, J.**            **March 17, 2008**

   Presently before the Court are Defendant Robert Herdelin's Motion for Summary Judgment as to Counts I and II of Plaintiff's Amended Complaint (Doc. No. 38), Defendant 44 Financial's Motion for Summary Judgment as to Count III (Doc. No. 41), and all responses thereto,[1] as well as all supplemental briefing.[2]  For the reasons set forth below, the Court GRANTS the Motions for Partial Summary Judgment of both Defendants.

---

   [1] Because the vast majority of the arguments of the Defendants are identical and deal with identical factual circumstances, we consider these Motions together in this Memorandum.

   [2] On December 1, 2006, and March 14, 2007, the parties were ordered to submit supplemental briefs to provide further clarity to the amount and nature of Plaintiff William Sherlock's bankruptcy debts around the time the loan at issue in this case was considered and secured.

**BACKGROUND**

On April 20, 2000, Plaintiff William Sherlock filed for bankruptcy under Chapter 11, for purposes that will be explored more fully below.[3]  At that time, Mr. Sherlock owned assets, individually and jointly with his wife, Plaintiff Patricia Sherlock, valued at $3,529,220.00.  Mr. Sherlock also owed debts in the amount of $3,193,518.00 at that time.  On August 25, 2000, Judge Raymond Lyons of the U.S. Bankruptcy Court, District of New Jersey entered an Order *sua sponte* converting Mr. Sherlock's individual Chapter 11 bankruptcy to Chapter 7 under the supervision of Barry Frost, the Chapter 7 trustee.  According to Mr. Sherlock, at that time he was seeking to liquidate his assets and completely pay off all of his creditors.

Between August, 2000, and April, 2003, the trustee distributed already-liquid payments and sold numerous assets to pay off Mr. Sherlock's various creditors.  Among those assets sold were Mr. Sherlock's 100% stock ownership of two companies of which he was a principal - Bi-Tech, Inc., and B-Tech Industries, Inc. - and the Sherlocks' primary residence at that time, in Medford, New Jersey.  Upon the sale of the Sherlocks' Medford

---

[3] For the sake of efficiency, our summary of the facts in this case focuses only on those that are immediately relevant to the Motions before us. Where certain portions of the record deserve greater detail, we provide it in our legal analysis below.

2

home in June, 2001, the Sherlocks moved to another previously-owned residence at 106 119th Street, Stone Harbor, New Jersey.

As of April, 2003, Mr. Sherlock still owed approximately $1,700,000 in Chapter 7 debts,[4] including the $1,200,000 mortgage on the Stone Harbor property.  On April 1, 2003, Judge Lyons entered an Order permitting the trustee to sell the Sherlock's residence in Stone Harbor under a structured timeline, and reserving to the debtor the right to file a motion to refinance the property to pay a 100% dividend to all remaining creditors. Before the property could be sold, however, on April 28, 2003, one of Mr. Sherlock's bankruptcy counsel informed the trustee that Mr. Sherlock was attempting to obtain refinancing for the Stone Harbor residence to pay off his bankruptcy creditors and discharge the bankruptcy.

Around that time, the Sherlocks contacted Defendant 44 Financial to assist in arranging financing to refinance the Stone Harbor mortgage.  Bernard McTamney, a representative of 44 Financial, introduced the Sherlocks to Defendant Robert Herdelin, a private lender.  The Sherlocks secured from Mr. Herdelin a refinancing commitment for the Stone Harbor property in an amount up to $1,900,000.00.  On July 22, 2003, after receiving

_____

[4] A more detailed breakdown of these debts is examined in the Discussion section below.

permission from Judge Lyons to proceed with the refinancing, Plaintiffs received a Mortgage Note from Herdelin in the amount of $1,789,570.91, to be secured by a mortgage on the Stone Harbor property and to be repaid within one year.  According to Mr. Sherlock's deposition testimony, Plaintiffs also prepaid all interest on the loan at that time.

Alleging that the finance charges for the loan transaction exceeded $260,000, and that this was an excessive amount, on June 18, 2004, Plaintiffs' counsel for this action forwarded a letter to Mr. Herdelin indicating that they wished to rescind the loan transaction due to TILA disclosure violations.  On June 24, 2004, Mr. Herdelin responded by contending that the loan was a business transaction, and that therefore neither TILA nor HOEPA applied. Thus, Mr. Herdelin refused to release the mortgage lien or refund any money to the Sherlocks.

On July 21, 2004, Plaintiffs filed a Complaint, and on October 6, 2004, filed an Amended Complaint, in this Court against Defendants Herdelin and 44 Financial, alleging violations of the Truth in Lending Act (TILA), Home Ownership and Equity Protection Act (HOEPA), and Real Estate Settlement Procedures Act (RESPA), as well as several state law claims, including fraud,

civil conspiracy, and unjust enrichment.[5]  To briefly summarize
those Counts, Plaintiffs allege that when they obtained the loan
from Mr. Herdelin (hereinafter "the loan" or
"the Herdelin loan"), he did not provide the Truth-in-Lending
Disclosure Statement and/or Notice of Right to Cancel, as
required by TILA.  Thus, Plaintiffs claim that they were entitled
under that statute to rescind the loan transaction and seek to
recover both statutory damages and all paid finance charges,
pursuant to TILA, 15 U.S.C. §§ 1640(a)(2)(A)(iii), 1640(a)(3),
and 1640(a)(4), and HOEPA, 15 U.S.C. § 1635(b).  Plaintiffs
further claim that 44 Financial charged an excessive fee for its
role in the transaction, and that in sharing that fee with
another party, 44 Financial violated certain provisions of RESPA,
12 U.S.C. §§ 2607(a) and 2607(b).[6]

Both Defendants now move for Summary Judgment as to Counts
I, II, and III of the Amended Complaint, which comprise all
portions of the Amended Complaint that purport to be based on

_____

[5] Count IV of the Amended Complaint also alleged violations of the New
Jersey Consumer Fraud Act, N.J.S.A. § 56:8-2, and the New Jersey Licensed
Lenders Act, N.J.S.A. § 17:11C-20.  On December 1, 2004, we granted
Defendants' Motions to Dismiss that Count under F.R.C.P. 12(b)(6).  We denied
those Motions, however, as to Counts I (TILA), II (HOEPA), and III (RESPA).

[6] Plaintiffs further allege that after they filed their original
complaint, Defendants fraudulently attempted to show that they complied with
TILA by producing fake disclosure forms with forged signatures.  While this
is, to be sure, a serious charge, it is not relevant to the Motions under
consideration here, which deal only with whether TILA, HOEPA, and RESPA even
applied in the first place.

federal law.  Specifically, Defendants argue that because the
Herdelin loan was taken for primarily business purposes, the
provisions of TILA, HOEPA, and RESPA - which apply only to
"consumer" transactions - do not apply.


## STANDARD OF REVIEW

It is recognized that the underlying purpose of summary
judgment is to avoid a pointless trial in cases where it is
unnecessary and would only cause delay and expense.  Goodman v.
Mead Johnson & Co., 534 F.2d 566, 573 (3d Cir. 1976).  Summary
judgment is proper "if there is no genuine issue as to any
material fact and the moving party is entitled to judgment as a
matter of law."  Fed. R. Civ. P. 56(c).  An issue is genuine only
if there is sufficient evidentiary basis on which a reasonable
jury could find for the non-moving party, and a factual dispute
is material only if it might affect the outcome of the suit under
governing law.  Kaucher v. County of Bucks, 456 F.3d 418, 423 (3d
Cir. 2006), citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242,
248 (1986).  If the non-moving party bears the burden of
persuasion at trial, "the moving party may meet its burden on
summary judgment by showing that the nonmoving party's evidence
is insufficient to carry that burden."  Id., quoting Wetzel v.
Tucker, 139 F.3d 380, 383 n. 2 (3d Cir. 1998).  In conducting our

6

review, we view the record in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor.  See Nicini v. Morra, 212 F.3d 798, 806 (3d Cir. 2000).  However, there must be more than a "mere scintilla" of evidence in support of the non-moving party's position to survive the summary judgment stage.  Anderson, 477 U.S. at 252.

## DISCUSSION

I.  **Do TILA and RESPA Apply to the Loan Transaction in Question?**

A.  **Legal Standard for Applicability of TILA and RESPA**

The sole legal question before us on Defendants' Motions for Summary Judgment is whether the Herdelin loan falls within the ambit of TILA and RESPA.  The Truth-in-Lending Act (TILA) applies only to "consumer" credit transactions, which the statute defines as transactions in which "the money, property, or services which are the subject of the transaction are primarily for personal, family, or household purposes."  15 U.S.C. § 1602(h); 12 C.F.R. § 226.2(a).  Concomitantly, TILA explicitly provides that it does not cover "[c]redit transactions involving extensions of credit primarily for business, commercial, or agricultural purposes."  15 U.S.C. § 1603(1).[7]  The Real Estate Settlement Procedures Act

_____

[7] Plaintiffs claim under HOEPA are also subject to this exemption, as HOEPA is simply an amendment to TILA that heightens the disclosure requirements for certain types of loans made at higher interest rates or with

(RESPA) has an identical provision, and thus also does not apply to extensions of credit made "primarily for business" purposes. 12 U.S.C. 2606(a)(1).[8]  Defendants argue that the mortgage given by Herdelin to the Plaintiffs was primarily to pay off Mr. Sherlock's business debts, and thus that extension of credit does not fall within the scope of either TILA or RESPA.  As a result, Defendants contend, they were not required to make the disclosures mandated by those statutes.

The plaintiff invoking TILA's protections bears the burden of showing that a disputed transaction is "a consumer credit transaction, not a business transaction."  Katz v. Carte Blanche Corp., 496 F.2d 747, 751 (3d Cir. 1974); Gombosi v. Carteret Mortgage Corp., 894 F. Supp. 176, 180 (E.D. Pa. 1995).  To determine whether the purpose for the extension of credit was consumer- or business-related, and thus whether TILA applies to it, we examine the transaction as a whole and take into account "the entire surrounding factual circumstances."  Id. at 180

---

excessive costs or fees.  See 15 U.S.C. 1602(aa)(1); see also In re Community Bank of N. Va., 418 F.3d 277, 304 (3d Cir. 2005).  Accordingly, our analysis under TILA applies equally to both Counts I and II of Plaintiffs' Amended Complaint, which put forth TILA and HOEPA claims, respectively.

[8] In fact, the statute directs that in the promulgation of regulations under RESPA, the exemption for extensions of credit made for business or commercial purposes is to be interpreted in the same way as its sister provision in the TILA, 15 U.S.C. 1603(1).  See 12 U.S.C. 2606(a)(2).  As these provisions of RESPA and TILA are identical, we will treat them together for purposes of disposing of each Defendant's Motion for Summary Judgment.

(citing Tower v. Moss, 625 F.2d 1161, 1166 (5th Cir. 1980)); see also Quinn v. A.I. Credit Corp., 615 F. Supp. 151, 154 (E.D. Pa. 1985).  If the credit was extended for both personal *and* business reasons, that does not automatically bring the transaction within TILA's purview.  Gombosi, 894 F. Supp. at 180; Quinn, 615 F. Supp. at 153.  Rather, we must determine whether the transaction was made *primarily* for "personal, family or household purposes." Id.

Plaintiffs first argue that the loan given by Herdelin was taken primarily for personal or family reasons because it was simply a refinancing of the mortgage on their personal residence. However, courts faced with similar arrangements have been virtually unanimous in finding that the mere fact that the loan was secured by the family home does not itself bring the transaction under TILA.  See, e.g., Sherrill v. Verde Capital Corp., 719 F.2d 364, 367 (5th Cir. 1983)(TILA inapplicable to loan, secured by plaintiff's home, intended to raise working capital for individual's business raising horses); Poe v. First Nat'l Bank of DeKalb County, 597 F.2d 895, 896 (5th Cir. 1979)(TILA inapplicable to business loan secured by husband and wife's personal property); Gombosi, 894 F. Supp. at 180 (refinanced mortgage not subject to TILA because proceeds went primarily to individually-owned business); Bokros v. Associates

9

<u>Finance, Inc.</u>, 607 F. Supp. 869 (N.D. Ill. 1984)(loan secured by junior mortgage on house not within scope of TILA where slightly more than half of proceeds were used to buy tractor for debtor's business);  <u>In re DiPietro</u>, 135 B.R. 773 (Bankr. E.D. Pa. 1992) (TILA inapplicable to loan that was secured by personal home but used to finance tailor shop).  Rather, the purpose for which the credit was obtained - not the nature of the collateral used to get it - is the focus of the TILA exemption inquiry.  <u>See</u> <u>Sherrill</u>, 719 F.2d at 367 ("[T]he purpose of the transaction or extension of credit is controlling, and not the property on which a security interest is retained.").  Plaintiffs attempt to get around this point by arguing plainly that the "purpose" of the loan transaction was "to refinance Debtor's residence as well as some additional personal debts of Plaintiffs."  The mere fact that the mortgage on the home was refinanced, however, does not shed light on the actual *purpose* for which the particular loan at issue *here* was obtained from Defendant Herdelin.

Indeed, Plaintiffs' situation is similar to the one this Court addressed in <u>Gombosi v. Carteret Mortgage Corp.</u>, 894 F. Supp. at 181.  In <u>Gombosi</u>, the plaintiffs had refinanced an existing residential mortgage with a different lender by obtaining a loan from the defendant in order to (1) pay off existing debts and (2) come away with additional proceeds beyond

10

the value of those debts and the mortgage.  Id.  Because the plaintiffs were not asserting that the new loan presented more favorable terms than the existing mortgage, and because satisfaction of the existing mortgage was a precondition for the new loan, the Court focused on how the remaining proceeds of the new loan were to be used after the pre-existing mortgage was repaid.  Id.  In finding that the new loan was primarily for business purposes, and thus that TILA did not apply, the Court in Gombosi noted that while a few thousand dollars ultimately went to the personal expense of school tuition, the rest of the proceeds went to paying an existing business-related debts and for future business expenses.  Id.

**B.  Primary Purpose of the Herdelin Loan**

Plaintiffs' situation here is very similar to the one addressed in Gombosi; the Plaintiffs essentially replaced their existing mortgage with one from Defendant Herdelin that provided extra proceeds for paying off existing debts and gave further cash for other expenses.[9]  And, as in Gombosi, Plaintiffs here do

_____

[9] Defendants contend that the property in question was purely a rental property because Plaintiffs had rented it out during the summer months for several years.  However, it appears from the record that Plaintiffs had moved into the house full-time and it had become established as their permanent residence well before the loan in question was made.  Furthermore, the merely occasional rentals, while for a substantial amount of money, occurred too infrequently to transform the property from a second home into a "rental property."  Nevertheless, whether the residence was purely a "rental property"

not assert that they took the loan in question to improve the
terms of their loan on their house; indeed, Mr. Sherlock's own
attorney advised against undergoing the transaction because of
the substantial risks involved.  So, like the Court in Gombosi,
we find that the Sherlocks refinanced their old mortgage not
primarily for their own personal purposes, but to use the
proceeds for paying off existing debts.  Thus, we too "find that
the disposition of those remaining proceeds must weigh heavily in
determining the primary purpose" of the loan, id. at 181, and
thus we must examine how those proceeds of the loan were intended
to be used.[10]

     There is no dispute that the majority of the remaining
proceeds were to be used to pay off Mr. Sherlock's remaining
Chapter 7 debts; indeed, this was an express condition of the
loan from Mr. Herdelin, presumably to ensure that he would have a
priority claim to the property that provided security for the
loan.  Indeed, Mr. Sherlock acknowledged that paying off
bankruptcy creditors was his primary reason for seeking to
refinance his mortgage with the Herdelin loan, and his bankruptcy

_____

or a home for personal use does not matter for our purposes, as Gombosi makes
clear that a loan secured by personal property can still be "primarily for
business purposes" under TILA.

     [10]   Plaintiffs appear to agree with this approach, as they acknowledged
in their first supplemental brief that the satisfaction of the ESB mortgage
should be deducted from our investigation of the Plaintiffs' debts.  (P. Supp.
I, p. 1).

attorney, Allen Etish, noted that the "refinance transaction" was a "method of resolving this bankruptcy."  Thus, to determine the primary purpose of obtaining the Herdelin loan, we must examine the nature of the debts which were to be paid off.  See Gombosi, 894 F. Supp. at 181.

Specifically, in April, 2003, when Plaintiffs first approached the Defendants about the loan in question, $570,879.40 was still owed in bankruptcy debts, after the deduction of the ESB mortgage.  These debts can be separated into three categories: (1)pre-bankruptcy debts incurred as a result of Mr. Sherlock's business activities; (2) pre-bankruptcy debts incurred as a result of personal expenditures; and (3) costs and fees related to the administration and disposition of the bankruptcy itself.  Since we must examine the totality of the circumstances surrounding the loan, see id. at 180; Quinn, 615 F. Supp. at 154, we also consider Mr. Sherlock's stated purposes for obtaining this particular loan from Herdelin, rather than from another lender.  After examining the nature of each remaining bankruptcy debt at the time of the Herdelin loan and the other surrounding factual circumstances, we find that the Herdelin loan had a primarily *business* purpose.

### 1.  Debts related to, or arising out of, Mr. Sherlock's business dealings

Plaintiffs acknowledge that several of the bankruptcy claims filed against Mr. Sherlock are appropriately characterized as business debts.  First, among the other bankruptcy debts still outstanding in April, 2003, Mr. Sherlock owed $120,142.03 to the Internal Revenue Service (Bankruptcy claim number 19) and $13,233.00 to the State of New Jersey Division of Taxation (claim nos. 20-22) in taxes and civil penalties on his businesses, Bi-Tech, Inc. and Bi-Tech Industries, Inc.  Plaintiffs admit that these taxes and penalties, which were filed as claims against Mr. Sherlock personally but levied on his businesses, are "business debts" for TILA purposes.  Second, Plaintiffs also admit that a bankruptcy claim submitted by Harriet's Oil Service for $1000.00 is properly characterized as a "business debt."  This debt stems from work done by Harriet's Oil Service for Mr. Sherlock's business, Bi-Tech, Inc.  Third, attorney Mark Kancher - whom Mr. Sherlock explained in his deposition was his "business attorney" - filed a claim in the amount of $23,908.75 (claim no. 3).  Mr. Kancher's affidavit indicates - and Plaintiffs do not dispute - that of this claim, approximately one-third was related to work done for Mr. and Mrs. Sherlock's personal assets, and two-thirds stemmed from work done for Mr. Sherlock's business assets and efforts to purchase a machine shop for his businesses.  Thus,

14

$15,939.17 of Mr. Kancher's claim (two-thirds of the total) is properly characterized as a business debt; the remainder, $7,969.58, is more appropriately characterized as a personal debt, and will be placed in that category.

The parties disagree, however, about whether two other bankruptcy claims filed against Mr. Sherlock should be classified as business debts. Specifically, at the time he sought the loan from Mr. Herdelin, Mr. Sherlock still had two judgment liens against him that resulted from lawsuits by Charles Grady (claim no. 8) and Bridgeton Meat Corporation (claim no. 9). The Grady claim originally stemmed from an agreement between Mr. Sherlock and Mr. Grady, a former business partner of Sherlock's, to sell all of Grady's ownership interests in Bi-Tech Manufacturing, Inc. to Sherlock. When Mr. Sherlock refused to pay Grady after learning that Grady may have defrauded the company during his time there, Grady filed a breach of contract suit to force performance of the agreement. Judgment was entered in favor of Grady against Mr. Sherlock personally for $75,000.00 plus interest, and Grady eventually filed his bankruptcy claim in the amount of $80,235.45. The Bridgeton claim stemmed from a $250,000.00 loan given to Mr. Sherlock personally that was secured by a second mortgage on an investment property owned by the Sherlocks in Mount Laurel, New Jersey. When Mr. Sherlock

15

filed for bankruptcy, Bridgeton filed a complaint in the Superior
Court of New Jersey against the Sherlocks, Bi-Tech Corporation,
and Bi-Tech, Inc., and secured a default judgment against Mrs.
Sherlock for $302,412.34.  After various actions in bankruptcy
including a reduction in the amount owed and an offset by the
sale of the property, at the time the Sherlocks were considering
the Herdelin loan, Bridgeton was still owed $53,671.44.

Plaintiffs argue that because the judgments were entered
against Mr. and Mrs. Sherlock *personally*, the bankruptcy debts
based on those judgments should be classified as primarily
"personal."  Plaintiffs further contend that the proceeds of the
Bridgeton Meat loan were deposited in Mr. Sherlock's personal
account and some of the proceeds used for personal expenditures,
and that this also supports classifying that debt as "personal"
in nature.  We disagree with all of these arguments.  As we have
already noted, the courts that have considered the threshold
question of whether a loan has a "primarily business purpose"
have looked not at the status of the debtor, creditor, or
collateral used, but rather at the ultimate purpose for which the
funds were used.  Whether a judgment is obtained against an
individual personally or against the corporation of which he is a
100% owner makes no difference in this inquiry.  Instead, we must
examine how the funds were used or intended to be used, and the

16

circumstances surrounding the transaction in question, to determine whether its purpose was primarily business or primarily personal.  With this in mind, we find that the Grady claim is unquestionably business-related.  The judgment in question came from an action between two parties in their roles as businesspeople who had a dispute over a sale of stock of a corporation.  Plaintiffs do not even suggest how such a transaction could have a "personal, family, or household" purpose.  Furthermore, Mr. Sherlock explicitly stated in his deposition that the Grady claim was business-related:

> Q: Charles Grady, was that related to your business?
> A: Yeah, sure it was.

(W. Sherlock Dep., Mar. 28, 2005, at 36).  As the Grady loan was clearly business-related, it is appropriate characterized as a business debt, and thus had a business purpose under TILA.

Similarly, Mr. Sherlock also stated in his deposition that, although the loan proceeds were given to him personally, the Bridgeton Meat loan was business-related:

> Q: Bridgeton Meats, is that related to your business, Bi-Tech?
> A: Yeah, it was.
> Q: So they were a commercial creditor?
> A: Well, he lent my business $250,000.00 and I signed personally but he lent the business $250,000.00.

17

( Id.).  This testimony is consistent with Bridgeton Meat's state court complaint, in which it described its action against the Sherlocks and the Bi-Tech companies as one "for collection of debt and breach of commercial loan and stock/profit sharing." (Def. Herdelin Supp. Brief I, Ex. 2).  In the face of this clear testimony, Plaintiffs' vague assertion that the funds were for personal expenses is not sufficient to bestow "personal" status on this debt.  The vast majority of the checks written from the account containing these funds, as they appear in the record, are made out to businesses and individuals whose identities the Plaintiffs do not explain.  We also note that Plaintiffs have not explained why, if these funds were to be used primarily for "personal" purposes, several of the checks were made out to Bi-Tech and Bi-Tech Corporation.  Even under the favorable summary judgment standard, Plaintiffs have not met their burden in showing the Bridgeton Meat loan to have a "primarily personal, family, or household" purpose, and thus we must characterize it as a business debt.

In sum, the bankruptcy debts clearly falling under the category of business debts total $284,221.09.

**2.  Debts related to personal, family, or household expenditures of Mr. and Mrs. Sherlock**

Of the remaining unpaid bankruptcy claims at the time of the Herdelin loan, we can characterize two as "personal." First, the accounting firm Alloy, Silverstein, Shapiro, Adams, Mulford & Co. had filed a bankruptcy claim against Mr. Sherlock for an unpaid balance of $2,322.00 (claim no. 2). Plaintiffs submitted evidence showing that the unpaid charges were primarily related to services performed in the filing of the Sherlocks' individual federal income tax returns in 1997 and 1998. Second, at the time of the Herdelin loan the Plaintiffs owed unpaid property taxes on their Stone Harbor, New Jersey home. It is unclear from the record exactly how much was owed, but Plaintiffs submitted canceled checks showing that shortly after the loan proceeds were distributed, two payments were made to the Borough of Stone Harbor totaling $61,934.18. We accept that for the purposes of our TILA threshold inquiry, this amount is what was owed at the time the loan was made.[11] Finally, we add the portion of Mr. Kancher's attorney fees for personal services rendered to Mrs. Sherlock, which are equal to $7,969.58 (one-third of the total $23,908.75). Accordingly, the sum of the debts falling under the category of *personal* debts is $72,225.76.

_____

[11] It does not appear from the record that the Borough of Stone Harbor submitted a bankruptcy claim for the unpaid real estate taxes. However, as there is sufficient evidence to show that this debt had in fact been accrued before the Herdelin loan was made, we place under the umbrella of all of Plaintiffs' debts.

### 3.  Debts arising out of Mr. Sherlock's Chapter 7 bankruptcy proceedings

The remainder of the bankruptcy claims against Mr. Sherlock appear to be related to the administration and disposition of the Mr. Sherlock's individual bankruptcy estate.  At the time the Herdelin loan was taken, Barry Frost, the Chapter 7 trustee, and his firm, Teich, Groh, Frost and Zindler, were owed approximately $80,000.00 in trustee legal fees and roughly $65,000.00 in commissions.[12]  The United States Trustee for the District of New Jersey also filed a claim in the bankruptcy case for $500.00, reflecting administrative expenses.  Finally, the law firm of Kenney & Kearney LLP, which represented Mr. Sherlock for purposes of his bankruptcy filings, received $86,932.55 at the time of the Herdelin loan for those bankruptcy-related services.

Though Plaintiffs urge that these debts should be characterized as "personal" debts because they related to the "personal" bankruptcy proceedings of Mr. Sherlock, we find that they should not receive any weight in our determination of whether the outstanding debts were primarily personal or business in nature.  These costs would have been incurred regardless of

---

[12] These amounts were later specified by Bankruptcy Judge Lyons to be $78,481.00 in legal fees, $1,796.46 in expenses, and $52,449.89 in Mr. Frost's commissions.  However, as we explain below, the exact amount of any debt related to the bankruptcy itself is irrelevant for our inquiry.

20

the purpose for the bankruptcy and thus do not shed any light on whether the Herdelin mortgage's purpose of paying off bankruptcy debts was primarily business- or personal-related.  See Gombosi, 894 F. Supp. at 181 (refusing to consider costs of refinancing mortgage because those costs would have been incurred regardless of the purpose of those proceedings).

Since we will not consider the bankruptcy-related debts in our inquiry about the status of the bankruptcy debts, we compare only those categorized as "business" debts with those categorized as "personal" debts.  The remaining business debts, which total $284,221.09, clearly outnumber the remaining personal debts, which total $72,225.76.  This comparison weighs in favor of finding that the Herdelin loan was taken primarily for business-related purposes.[13]  See Bokros, 607 F. Supp. at 872 ("If

---

[13] We are further persuaded to this conclusion by Mr. Sherlock's statements about the reasons he entered bankruptcy in the first place.  In his March 28, 2005, deposition, Mr. Sherlock explained that his business, Bi-Tech, was not failing and that that was not the reason for filing for Chapter 11 (later converted to Chapter 7) bankruptcy.  Rather, he stated, "I had another business in Texas, in Dallas, I was doing pretty well with the business down there and basically just need[ed] time to develop a war chest of capital and so bankruptcy gave me an automatic stay to do that."  W. Sherlock Dep., March 28, 2005, at 33.  In the absence of any evidence from Plaintiffs to the contrary, this also weighs in favor of finding that the refinancing was intended to pay the debts of a bankruptcy stemming from business motivations.

Mr. Sherlock's testimony in this regard also demonstrates why focusing on the status of the debtor does not aid the TILA exemption inquiry, as in this case the line between corporation and individual was extremely blurred. In his deposition, the following line of questioning was particularly illuminating of this situation:

Q: What was the difference in your mind by filing a Chapter 11 in your own name as opposed to one of the corporate names?
A: Because I owned the assets.  I had the real estate buildings.

'primarily' is to have any substantive content (as it must) . . .
it must refer to the use of more than half the funds.").

### 4.  Stated Reasons for Obtaining the Loan from Herdelin

Also weighing heavily in our determination that the Herdelin
loan was taken primarily for business purposes are the deposition
statements made by Mr. Sherlock about the reasons he chose
Herdelin as a creditor.  Mr. Sherlock stated in his deposition
that, at the time the Herdelin loan became an option for him, he
had already secured an alternative commitment from Immigrant Bank
to provide funds, in the form of a mortgage refinancing, to pay
off his bankruptcy debts.  (W. Sherlock Dep., March 31, 2005, at
92).  He explained, however, that he did not consider it an
optimal solution because Immigrant Bank would only provide just
enough funds to pay off his existing debts, and nothing beyond
that.  (Id.).  The reason for that was that he "wanted to get so
much cash out for business opportunities and expenses going
forward."  (Id.).

---

I had 100 percent of the stock of the corporations, so I wanted to
reorganize my positions.

W. Sherlock Dep., March 28, 2005, at 11.  Thus, yet again we must reject
Plaintiffs arguments that a loan to pay off bankruptcy debts had a personal
purpose merely because it was the individual, rather than the corporation,
that declared bankruptcy.

Thus, Mr. Sherlock stated that he was directed to Defendant 44 Financial to seek out alternative financing arrangements. When asked how he came to learn about 44 Financial, Mr. Sherlock explained that he believed he became aware of them through Commerce Bank which, he noted, "had various people they recommended for business loans." (Id. at 83).  Mr. Sherlock elaborated on this by explaining why the bank would refer outside lending agencies like 44 Financial for business loans in particular:

> Q: Any particular reason -- why business loans or was it just business loans that –
>
> A: Well, sometimes you try to raise money for business opportunities, and often the bank likes historical data, meaning corporate returns and things of that nature.  So when you talk to your friend at the bank, they say these kind of people might take a little more risk, that they're not governed by the same rules that we are as a major bank.

(Id.)  Mr. Sherlock then stated that he believes he got in contact with 44 Financial through his "business attorney, Mark Kancher."  (Id.)  44 Financial then connected him to Mr. Herdelin, a private lender who was willing to provide terms of financing with Mr. Sherlock that were closer to what he was looking for.  In fact, Mr. Sherlock had stated earlier in his testimony that although the Immigrant Bank deal would have allowed him to pay off all his creditors, at closing with Mr.

23

Herdelin he sought $50,000 "cash out," which would enable him to "go forward" in a way that the Immigrant loan would not.  (Id. at 50).

Mr. Sherlock's testimony clearly indicates that in taking the Herdelin loan over the Immigrant Bank loan, one of Mr. Sherlock's goals was to have a source of funds for business endeavors going forward after paying off his bankruptcy debts. This weighs in favor of a finding that the Herdelin loan was a transaction primarily for business purposes, and Plaintiffs have not provided evidence to rebut such an inference.

## C.  Conclusion

It is clear from the evidence in the record that Plaintiffs' primary purpose in obtaining the loan at issue from Mr. Herdelin was to pay off various business-related debts and to obtain cash for ongoing business endeavors.  Plaintiffs have failed to carry their burden of providing any evidence to rebut this, and have further failed their positive burden of providing evidence to support a finding that the Herdelin loan was taken primarily for personal purposes.[14]  Instead, Plaintiffs incorrectly focus on

---

[14] Though Plaintiffs contend that their arguments about the primary purpose of the loan create an issue for the trier of fact, we may properly resolve the issue as a legal matter here.  "Where the relevant facts are not in dispute, the court may decide the TILA exemption question as a matter of law."  Gombosi, 894 F. Supp. at 182; Bokros, 607 F. Supp. at 872.  Although the parties here dispute the primary purpose of the Herdelin loan, the facts

the status of the individual taking the loan or the collateral providing security for the loan, rather than on the ultimate reason for acquiring the funds from that transaction.  In fact, they have provided virtually no argument as to what "personal, family or household" use the remaining loan proceeds were to be put, other than to simply state that they sought to "refinance." Thus, we must conclude that the money received from Herdelin was not primarily for personal, family, or household purposes, and thus the loan does not fall within the scope of either TILA or RESPA.[15]  Accordingly, Defendants' Motions for Partial Summary Judgment as to Counts I, II and III of Plaintiffs' Amended Complaint are GRANTED.

     An order follows.

---

relevant to determining that purpose are not in dispute.

    [15] We reiterate that TILA, HOEPA (which is essentially just an amendment to TILA) and RESPA all include the same threshold "business purpose" exemption, and thus our analysis applies equally to claims brought under all three statutes.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

WILLIAM F. SHERLOCK and    :
PATRICIA A. SHERLOCK,      :
                           :
        Plaintiffs,     :   CIVIL ACTION
                           :
    v.                  :   No. 04-cv-3438
                           :
ROBERT HERDELIN and      :
44 FINANCIAl CORP.,      :
                           :
        Defendants.     :

ORDER

    AND NOW, this  17th  day of March, 2008, upon consideration
of both Defendants' Motions for Partial Summary Judgment (Doc.
Nos. 38, 41), all responses thereto, and all subsequent
supplemental briefing, it is hereby ORDERED that the Motions are
GRANTED.  Judgment as a matter of law is hereby ENTERED in favor
of Defendants on Plaintiff's claims under the Truth in Lending
Act (TILA), Home Ownership and Equity Protection Act (HOEPA), and
Real Estate Settlement Procedures Act (RESPA), and Counts I, II,
and III of Plaintiffs' Amended Complaint (Doc. No. 8) are
DISMISSED.

                                        BY THE COURT:

                                        s/J. Curtis Joyner
                                        J. CURTIS JOYNER, J.